AO 91 (Rev. 01/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of New Jersey

| | |
|---|---|
| United States of America<br>v.<br>Michael Daniels, a/k/a "Drama"<br>*Defendant* | )<br>)<br>) Case No. 11-mj-1065 (AMD)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of _____ in the county of __Cumberland__ in the _____ District of __New Jersey__, the defendant violated __21__ U. S. C. § __846__, an offense described as follows:

From in or about September 2011 to in or about November 2011, in Cumberland County, in District of New Jersey, and elsewhere, defendant did knowingly and intentionally conspire and agree with B.S. and others to distribute and to possess with intent to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin, contrary to Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B).
In violation of Title 21, United States Code, Section 846

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Daniel Brown, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/09/2011

_____
*Judge's signature*

City and state: Camden, New Jersey

Ann Marie Donio, U.S. Magistrate Judge
*Printed name and title*

CONTENTS APPROVED

BY: *Jacqueline M. Carle*
JACQUELINE M. CARLE, AUSA

DATE: November 9, 2011

## AFFIDAVIT

1. I, Daniel Brown, have been employed as a Special Agent for the Drug Enforcement Administration ("DEA") since 1995, and I am currently assigned to the DEA Atlantic City Resident Office where I investigate, gather evidence, and make arrests for violations of Title 21 and Title 18 of the United States Code and other federal criminal laws. I have participated in and received training as a DEA Special Agent in conducting investigations into violations of the federal drug laws. Through the course of my career, I have participated in well over 500 drug investigations utilizing investigative techniques such as witness interviews, physical and electronic surveillance, confidential informant intelligence, and search warrant executions. In addition, I acted as an undercover officer making controlled purchase during the course of my career on over 100 occasions. In my capacity as an undercover officer, I have purchased heroin in a controlled setting. I have also testified as an expert witness as to the method and means of drug trafficking in the federal court in the District of New Jersey and the Eastern District of Pennsylvania, as well as state court in New Jersey and Pennsylvania.

2. The facts set forth in this affidavit are based on my own investigation and conversations with other individuals involved in this investigation. I have not included all of the facts known to me in this affidavit, just those facts which I believe are necessary to establish probable cause. Where I assert that an event occurred on a particular date and time, I am asserting the event occurred on or about the date and time alleged. Where the contents of statements and conversations of others are set forth in this Affidavit, they are set forth in substance and in part, except where otherwise indicated.

3. State and federal law enforcement partnered to investigate the activities of Benjamin Snipe, a/k/a "Smoke Out" and his associates. Information developed through the investigation revealed that Snipe is the leader of a narcotic distribution network involving the distribution of heroin and other illegal substances in the Cumberland County, New Jersey area. The investigation further revealed Snipe's co-conspirators to include: (1) Byron Hughes, a/k/a "Max," a/k/a "Good Brother;" (2) Michael Daniels, a/k/a "Drama;" (3) Angel Sykut; (4) Melvin D. Carter, Jr., a/k/a "Mel;" (5) William Knipe, a/k/a "Toby;" and (6) Michael D. Houston, a/k/a "Tootie."

4. On August 5, 2011, law enforcement obtained a state-authorized Dialed Number Retriever ("DNR," often referred to in the federal system as a "pen register") to retrieve and record telephone numbers occurring over telephone facility 856-364-4257, a cellular telephone subscribed to by "Tyrone Armstead, 316 South Fourth Street, Millville, NJ" and utilized by Benjamin Snipe and several of his co-conspirators to conduct drug transactions (hereinafter, "Target Telephone"). The DNR for the Target Telephone was established on August 15, 2011, at 7:00 a.m. and ran for a period of thirty (30) days. A total of Four Thousand Nine Hundred Seventy Six (4976) call events were recorded over the Target Telephone.

5. On September 12, 2011, law enforcement obtained a state-authorized Renewal Order which authorized a DNR for the Target Telephone for an additional thirty (30) days.

6. On September 16, 2011, law enforcement obtained a state-authorized order for the interception of Wire/Oral and Electronic Communications and maintenance of a DNR for the Target Telephone for a period of thirty (30) days. The effective date of the Order was established as September 19, 2011 at 7:00 a.m.

7. A state-authorized Amended Order was signed on September 25, 2011, adding a Subject Interceptee(s) to the Target Telephone.

8. A second state-authorized Amended Order was signed on October 5, 2011, adding a Subject Interceptee(s) to the Target Telephone.

9. On October 17, 2011, law enforcement obtained a state-authorized renewal order for the interception of Wire/Oral and Electronic Communications and maintenance of a DNR for the Target Telephone for a period of thirty (30) days. The effective date of the Order was established as October 18, 2011 at 7:00 a.m.

10. A criminal history check of **Benjamin Snipe, a/k/a "Smoke Out"** reveals several felony convictions including: (1) May 9, 1995 conviction for 3rd degree Distribution of Heroin/Cocaine in New Jersey for which he received a sentence of two (2) years probation; (2) December 6, 1996 conviction for 3rd degree Distribution of Marijuana in New Jersey for which he received a sentence of two (2) years probation[1]; (3) October 10, 1997 conviction for 3rd degree Possession of CDS in New Jersey for which he received a sentence of two hundred seventy (270) days in the county jail and two (2) years probation; (4) February 11, 1998 conviction for Attempting to Elude Police in New Jersey for which he received a sentence of seventeen (17) days in the county jail; (5) September 7, 1999 conviction for 3rd degree Distribution of Heroin/Cocaine in New Jersey for which he received a sentence of three (3) years probation[2]; (6) June 24, 2002 conviction for 4th degree Obstruction in New Jersey for which he received a sentence of three (3) months confinement in the county jail; (7) May 5, 2004 conviction for 4th degree

---

[1] On February 19, 2003, Snipe's probation was revoked, and he was confined to county jail for three (3) years.

[2] On October 3, 2001, Snipe was resentenced to three (3) years confinement in a state prison.

Hindering Apprehension in New Jersey for which he received a sentence of nine (9) months in the county jail; and (8) April 2, 2007 conviction for 3rd degree possession of CDS in New Jersey for which he received a sentence of three (3) years in state prison.

11. On September 19, 2011 at approximately 8:57 a.m., Snipe received an incoming call on the Target Telephone from Angel Sykut ("Sykut") (Session #18). The following interception is cited in pertinent part:

> PARTICIPANTS: **Benjamin Snipe (BS)**
> **Angel Sykut (AS)**
>
> BS: So listen. Just bring everything in and uh. Get the uh stamp right. Can you do that fore you leave then I'll come over and start stamping.
> AS: Yeah. Well if you're not um. If you're not ready now, cause all I gotta do is drop my truck off
>
> . . . . . .
>
> AS: alright I'm bout to start, what. You wan a different name on dem junes?
> BS: Yeah, yeah. Yeah.
> AS: What you want?
> BS: Uh, uh damn oh Gladiator
> AS: Gladiator
> BS: Gladiator
> AS: Alright

12. Based on my training and experience, I believe this conversation to be drug related. Specifically, I believe Snipe and Sykut were discussing packaging of heroin and that the stamp "Gladiator" would be stamped on the packages. During the course of the investigation, several interceptions from the Target Telephone revealed purchasers of heroin inquiring with Snipe and others about obtaining heroin stamped with "Gladiator."

13. On September 21, 2011 at 10:34 a.m., Snipe received an incoming call on the Target Telephone from Sykut (Session #547). The following interception is cited in pertinent part:

    **PARTICIPANTS:** **Benjamin Snipe = BS**
    **Angel Sykut = AS**

    AS: Ah.. Ya we was getting ready to walk through the hood
    BS: I'm..a bring me ahh.. two of them things, two bags
    AS: The whole thing, alright
    BS: Two bags
    BS: Ahh....um is there ahh any left from the um one I was picking out yesterday.
    AS: I think there's one left in from that one, I think, but Mel can check real quick. I think there's one left
    BS: Alright, well bring me that one and the whole thing then
    AS: Ok
    BS: That way I don't have to keep bugging you all day.
    AS: Alrighty
    BS: Alright, I'm at the crib.

14. Based on my training and experience, I believe this conversation to be drug related. Specifically, I believe Snipe and Sykut were discussing heroin. Snipe asked Sykut what was left of the heroin in her possession. "Two bags" refers to two (2) bags of heroin. "The whole thing" refers to at least a band of heroin which contains 10-12 bags of heroin. "Mel" is believed to be Melvin Carter, Jr., Sykut's paramour.

15. A criminal history check of **Byron Hughes, a/k/a "Max," a/k/a "Good Brother"** reveals several felony convictions including: (1) September 21, 1990 conviction for 3rd degree Conspiracy to Distribute CDS in New Jersey for which he received a sentence of probation; (2) July 17, 1991 conviction for 3rd degree Possession of Cocaine in New

Jersey for which he received a sentence of sixty days (60) suspended confinement and one (1) year probation; (3) February 17, 2009 conviction for 3rd degree Manufacture/Distribution of CDS in New Jersey for which he received a sentence of three (3) years probation; (4) December 4, 2009 conviction for 3rd degree Distribution of CDS in New Jersey for which he received a sentence of three (3) years probation.

16. On October 8, 2011 at 9:50 a.m., Snipe placed an outgoing call on the Target Telephone to Byron Hughes, a/k/a "Max," a/k/a "Good Brother" ("Hughes"). In sum and substance, Hughes asks Snipe to accompany Hughes to pick up additional narcotics. At first, Snipe declines to accompany Hughes, but offers his vehicle. Eventually, however, Snipe agrees to make the trip with Hughes the following day.

17. Based upon my training and experience, and the investigation to date, it is believed that Hughes wanted Snipe to travel with Hughes to Camden, New Jersey to obtain narcotics.

18. On September 27, 2011 at 10:45 p.m., Hughes placed an incoming call to the Target Telephone that was answered by Sykut. In following interception is cited in pertinent part:

**PARTICIPANTS:** **Angel Sykut = AS**
**Byron Hughes = BH**

**AS:** What's going on?
**BH:** Nothing, some my people trying to come uh see you
**AS:** What they needed?
**BH:** Huh?
**AS:** What they needed?
**BH:** They need a whole one
**AS:** A, a band?
**BH:** Yeah
**AS:** Okay, where um, where you tell them to go at?

| | |
|---|---|
| **BH**: | I guess where you told to go at before. Fifth and Florence or where you wanted to go? |
| **AS**: | Fifth and Florence? Just tell them to go all the way to the end of Fifth. All the way to the end of Fifth. |
| **BH**: | Um. And then what? |
| **AS**: | They can just wait there at the end of Fifth and let Mel go over there and meet 'em. |

19. Based on my training and experience, I believe this conversation to be drug related. Specifically, I believe Hughes and Sykut were discussing heroin. Hughes arranged to purchase a band of heroin and agreed to have individuals meet Melvin Carter, Jr. at 5th and Florence Streets in Millville, New Jersey.

20. A criminal history check of **Michael Daniels, a/k/a "Drama,"** reveals several felony convictions including: (1) March 6, 2003 conviction for 3rd degree Possession of a Handgun in New Jersey for which he received a sentence of three (3) years imprisonment; (2) June 19, 2006 conviction for 3rd degree Possession of CDS in New Jersey for which he received a sentence of three hundred sixty four (364) days in the county jail; (3) June 26, 2009 conviction for 4th degree Resisting Arrest in New Jersey for which he received a sentence of eighteen (18) months imprisonment; and (4) June 29, 2007 conviction for 3rd degree Theft in New Jersey for which he received a sentence of four (4) years imprisonment.

21. On October 7, 2011 at 12:43 p.m., Snipe received an incoming call on the Target Telephone from Daniels (Session #4881). The following interception is cited in pertinent part:

    **PARTICIPANTS:**   **Benjamin Snipe = BS**
    **Michael Daniels = MD**

> **MD:** Shit. Fucked up this couple days and shit I ain't makin nothing up man.
>
> **BS:** Man, you good, we back on board man. I had to go somewhere else, but they had the the same thing and and and it's fire. So just you know what I mean you get up here you you you grind back up to seven, eight real quick. I know how you grind, nigga.
>
> **MD:** Alright, hell yeah umm.
>
> **BS:** And it's fire so you should have no problem.
>
> **MD:** Alright, umm alright yeah I I'm come I'm come I'm gettin those. Just put that three up for me bro. I'm gettin that.

22. Based on my training and experience, I believe this conversation to be drug related. Specifically, I believe that Daniels contacted Snipe to obtain additional heroin for re-distribution. Snipe explained that he obtained good quality heroin from another source, so Daniels would have no problem re-distributing the heroin. Based upon the investigation to date, I believe that Daniels' request for "three up for me bro" is a request for three (3) bricks of heroin (approximately 150 bags of heroin).

23. On October 16, 2011 at 12:16 p.m., Snipe placed an outgoing call on the Target Telephone to Daniels. In sum and substance, Daniels requested "five" from Snipe, but Snipe only had "four" in his possession.

24. Based on my training and experience, I believe this conversation to be drug related. Specifically, I believe that Daniels contacted Snipe to obtain additional heroin for re-distribution. Based upon the investigation to date, I believe that Daniels' requested five (5) bricks of heroin from Snipe, but Snipe only had four (4) bricks of heroin in his possession.

25. A criminal history check of **Angel Sykut** reveals no prior felony convictions, but does show multiple arrests and convictions for misdemeanors in the State of New Jersey.

26. A criminal history check of **Melvin D. Carter Jr. a/k/a "Mel,"** reveals no prior felony convictions, but does show multiple arrests and a misdemeanor conviction for Possession of Marijuana in the State of New Jersey.

27. On September 26, 2011 at 11:18 a.m., Carter received an incoming call on the Target Telephone from an unknown female (Session #2037). The following interception is cited in pertinent part:

> **PARTICIPANTS:** Melvin D. Carter Jr = MC
> Unknown Female = UF
>
> **MC:** Hello
> **UF:** Where's Smoke at?
> **MC:** He out of town right now. What's up? I got everything.
> **UF:** Who dis? Who dis, Juice?
> **MC:** Na, this is Mel.
> **UF:** I need a B. What kind is it though?
> **MC:** A what?
> **UF:** What kind is the bundles? I mean dog food. What's the labels?
> **MC:** Gladiator.
> **UF:** I need a B. Where you at?
> **MC:** You need one?
> **UF:** Yep.
> **MC:** Where you at?
> **UF:** Um.Right on... What is this, Garrison. Third and Garrison.
> **MC:** In the Alleyway?
> **UF:** About to be.
> **MC:** Alright. Well. Stay right there. Somebody bout to come.
> **UF:** Which um. Which side you want me to stay on? Garrison side?
> **MC:** Yeah.
> **UF:** Alright. Hurry up.
> **MC:** The abandon house.

      UF:    Alright. I gotcha.
      MC:    Alright.

28. Based on my training and experience, I believe this conversation to be drug related. Specifically, I believe that Carter utilized the Target Telephone on behalf of Snipe ("Smoke") to sell heroin. In this intercepted telephone call, Carter negotiated the sale of a bundle stamped "Gladiator" to an unknown female in the area of Third and Garrison Streets in Millville, New Jersey.

29. On September 26, 2011 at 2:41 p.m., Carter received an incoming call on the Target Telephone from an unknown male (Session #2083). The following interception is cited in pertinent part:

      **PARTICIPANTS:**    **Melvin Carter = M**
                                    **Unknown Male = UM**

- **MC:** What's up yo. Who dis?
- **UM:** Well ahh. This ahh. Let me hollar at Smoke.
- **MC:** He out of town right now and I got the jack. What's up?
- **UM:** Oh, you got the jack? Shit. I needed one of them jauns. 45. He usually give it to me for 45 a piece.
- **MC:** Bro, I'm gonna be honest wit ya. He told me to get every, every jaun for 60.
- **UM:** Hah?
- **MC:** He told me to take every band for 60.
- **UM:** Alright. Shit.

30. Based on my training and experience, I believe this conversation to be drug related. Specifically, I believe that Carter utilized the Target Telephone on behalf of Snipe

("Smoke") to sell heroin. In this intercepted telephone call, Carter negotiated the sale of a bundle of heroin for $60.00 despite the unknown male's efforts to negotiate a lower price.

31. A criminal history check of **William Knipe, a/k/a "Toby"** reveals no prior felony convictions, but does show a misdemeanor conviction for Possession of Marijuana in the State of New Jersey.

32. On September 21, 2011, Knipe placed a telephone call to Snipe on the Target Telephone (Session #628, associated Session #630). In sum and substance, Knipe stated to Snipe that he had a customer who wanted a couple of bundles. Knipe also asked for cocaine during the same telephone conversation. Snipe responded that he only had crack cocaine and would have to check to see if he could obtain the heroin. Subsequently, Knipe placed a telephone call to Snipe on the Target Telephone that same day and ordered a bundle of heroin and a "dime" of crack cocaine.

33. On September 24, 2011 at 1:35 p.m. Knipe placed a telephone call to Snipe on the Target Telephone (Session #1566). The following interception is cited in pertinent part:

**PARTICIPANTS:** **Benjamin Snipe = BS**
**William "Toby" Knipe = WK**

WK: Yeah, you got any hard?
BS: Uh nope, I done lost that shit. I had some raw I lost it. I dropped that shit some dam where. Tob, you know me when I get high.
WK: Wow, you ain't got nothing then uh?
BS: I got some food. That it.
WK: Yea alright, alright I got somebody here who wants some hard.
BS: Alright

34. Based on my training and experience, I believe this conversation to be drug related. Specifically, I believe that Knipe sought to purchase crack cocaine ("commonly know as "hard") from Snipe for re-distribution. Snipe explained that while he did not have crack cocaine available, he did have "food," which is a coded term used throughout the wire for heroin.

35. On September 28, 2011 at 7:31 p.m., Knipe placed a call to the Target Telephone (Session # 2634). The following interception is cited in pertinent part:

    **PARTICIPANTS:**   **Angel Sykut = AS**
                              **William Knipe = WK**

- **WK:** Hey Angel its Toby
- **AS:** Hey what's going on?
- **WK:** Hey how long it gonna take for your boy to get to me?
- **AS:** Ah what you needed?
- **WK:** Bundle
- **AS:** A bundle?
- **WK:** Uh hum
- **AS:** Ah I can send down ah you know Smoke charges sixty (60) for his bundles right?
- **WK:** He charges what?
- **AS:** Sixty (60)
- **WK:** He charges me fifty (50).
- **AS:** Well he might. He does some like that. That's why I just got to tell you they say yeah I know then I know you are one of the one's that do fifty (50) but the ones that say he charges me fifty (50) then I know. Alright he'll do that errand.

36. Based on my training and experience, I believe this conversation to be drug related. Specifically, I believe that Sykut utilized the Target Telephone on behalf of Snipe

("Smoke") to sell heroin. In this intercepted telephone call, Sykut negotiated the sale of a bundle of heroin for $50.00 to Knipe.

37. A criminal history check of **Michael D. Houston, a/k/a "Tootie"** reveals multiple felony convictions including: (1) January 22, 2002 conviction for 4th degree Resisting Arrest in New Jersey for which he was sentenced to five (5) years probation[3]; (2) January 22, 2002 conviction for 3rd degree Possession of Marijuana and sentenced to five (5) years probation[4]; (3) November 10, 2003 conviction for 3rd degree Possession of CDS in New Jersey for which he was sentenced to three (3) years in state prison; and (4) November 10, 2003, convicted of fourth-degree Resisting Arrest and sentenced to nine (9) months in the county jail.

38. On September 20, 2011 at 10:37 a.m., Houston placed an outgoing telephone call on the Target Telephone to an unknown male (Session #317). The following interception is cited in pertinent part:

> **PARTICIPANTS:   Michael Houston = MH**
> **Unknown Male = UM**
>
> **UM:**   What you selling bricks like straight out you selling bands or bundles
> **MH:**   Nah bundles

39. Based on my training and experience, I believe this conversation to be drug related. Specifically, I believe that Houston utilized the Target Telephone on behalf of Snipe ("Smoke") to sell heroin. Houston appears to call back a number that appeared on the Target Telephone. The unknown male asks if Houston is selling bricks, bands, or bundles of heroin. Houston confirms that he is selling bundles.

---

[3] On January 2, 2004, Houston was resentenced to nine (9) months in the county jail.

[4] On January 2, 2004, Houston was resentenced to three (3) years state prison.

40. Based upon your affiant's experience, one bag of heroin contains approximately .01 grams of heroin. Furthermore, a "bundle" and a "band" are street terms used in the Cumberland County, New Jersey area to refer to approximately 10 bags of heroin, while a "brick" is a street term used in that same area to refer to approximately 50 bags of heroin. Your affiant reviewed the court-authorized interceptions occurring over the Target Telephone from September 19, 2011 through November 6, 2011. During that time, your affiant conservatively estimates the amount of heroin distributed by the Snipe drug organization to be in excess of 100 grams of heroin.